STATE OF MAINE
OXFORD, SS.

**DONALD L. GA**~~~~~~
LAW LIB.

**MAY 10 2000**

SUPERIOR COURT
Civil Action
Docket No. CV-99-06



RECEIVED AND FILED

MAY - 9 2000

Donna L. How..
CLERK OF COURTS

THOMAS RICE, ET ALS,

Plaintiffs

TEH- OXF - 5/9/2000

vs.

**DECISION AND ORDER**

AMERICAN SKIING COMPANY, ET ALS,

Defendants

This matter is before the court on the motion of the plaintiff Laurene Rice for summary judgment, dated December 6, 1999, directed to the defendants' counterclaim and on the defendants' motion for summary judgment, dated January 6, 2000, directed to the plaintiffs' complaint.

## FACTUAL BACKGROUND

The plaintiffs Thomas and Laurene Rice are the parents of the plaintiff Nicholas Rice. The defendants Sunday River Skiway Corporation (SRS) and Perfect Turn, Inc. (Perfect Turn), are affiliates of each other and subsidiaries of the defendant American Skiing Company (American Skiing).[1] SRS owns and operates the Sunday River Ski Resort in Newry, Maine (Sunday River). SRS also operates a ski school there called "Perfect Kids Children's

---

[1] On April 26, 2000, the parties filed a stipulation of dismissal without prejudice as to American Skiing Company and Perfect Turn, Inc.

1

Program" (ski school), but does not require individuals to enroll in the ski instruction program as a precondition to skiing at Sunday River. The defendant Timothy McGuire is employed by SRS as a ski instructor.

On December 13, 1997, the plaintiffs went to Sunday River to ski. Nicholas was almost nine years old at the time and Laurene enrolled him in the ski school. She selected the Level Three program for people who already had certain skiing skills.[2]

Prior to Nicholas' enrollment in the class, Laurene signed a form entitled "Acknowledgement & Acceptance of Risks & Liability Release" (Ski Enrollment Form) on behalf of herself and her son. The document began with a "WARNING" about the hazards of "Alpine activities"[3] and the challenges of the ski school program, then included language purporting to be a release by Laurene and Nicholas[4] of SRS and

---

[2]In deposition testimony, Timothy McGuire described that skill level:

Q. Would you please tell us again what Level Three meant in terms of skill level?

A. That it meant that they were able to form a wedge, to be able to stop and start and to get up on their own if they fall and they can put their skis on by themselves and that they have experience riding the chairlift.

Defendants' Statement of Material Facts, Ex. B at p. 22.

[3]The hazards included many of the dangers or conditions included in the definition of "inherent risks of skiing" in Maine's Skiers' and Tramway Passengers' Responsibilities Act. 32 M.R.S.A. § 15217(1)(A) (Supp. 1999). *See* Affidavit of Joseph R. Saunders, Esq.

[4]The document included the following language:

"As a parent/guardian with legal responsibility for a minor participant, I am authorized to sign this agreement for that child. I consent and agree for the minor child to be bound by this agreement ...."

"its owners, affiliates, employees and agents from any and all liability for all personal injury [ ] arising from any alleged negligence in the operation and maintenance or design of the ski area and other conditions such as those listed in the WARNING above."

*See* Affidavit of Joseph R. Saunders, Esq. The document concluded with Laurene's agreement to indemnify the defendants "for all awards, legal expenses and settlements arising out of" her child's participation in the ski school and his use of the Sunday River premises. Thomas did not sign the Ski Enrollment Form and there is no evidence that he was involved in the enrollment process. The parents went off to ski while Nicholas was in class.

The ski class began around 9:30 a.m. McGuire first taught the class "rule number one" which was "you don't pass the coach." Nicholas fell at one point during a training run in the morning session. McGuire and the rest of the class went further ahead, then stopped and formed a group. When the boy caught up to them, McGuire was finishing an instruction about a skiing maneuver for stopping called a "hockey stop".

The class broke for lunch at 11:15 a.m. and resumed shortly after the noon hour on a trail called Mixing Bowl. Ski conditions were good and the trail was in good shape. McGuire took his charges on a "fun run" down the slope again instructing the class not to ski past him. Nicholas fell and the group stopped further on to wait for him. He got up and began skiing toward them. He started going faster and panicked. As he approached the group, he could not slow down. He tried to do a "hockey stop", skied off the side of the trail, hit a tree and was injured.

---

*See* Affidavit of Joseph R. Saunders, Esq.

3

## DECISION

A summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Panasonic Communications & Sys. Co. v. State*, 1997 ME 43, ¶ 10, 691 A.2d 190, 194 (citing *Gonzales v. Comm'r, Dep't of Pub. Safety*, 665 A.2d 681, 682-83 (Me. 1995)). Even if the parties differ as to the legal conclusions to be drawn from the historical facts before the court, if there is no serious dispute as to what those facts are, consideration of a summary judgment is proper. *North East Ins. Co v. Soucy*, 1997 Me 106, ¶8, 693 A.2d 1141.

At the heart of it, the plaintiffs allege that the defendants, acting through McGuire, were negligent in their supervision of Nicholas. Laurene's separate claim for lost wages can only survive on the strength of this negligence claim. The defendants disclaim responsibility by virtue of the immunity provisions of Maine's Skiers' and Tramway Passengers' Responsibilities Act, 32 M.R.S.A. § 15217 (Supp. 1999), and the provisions of the Ski Enrollment Form signed by Laurene.

## Maine's Skiers and Tramway Passengers' Responsibilities Act

The threshold issue is whether the Act immunizes the defendants against liability for a claim of negligent supervision. The court concludes that it does not. The Act relieves ski area operator's from responsibility for injuries that result from the "inherent risks of skiing -- such as skiing into a tree. *Id*. However, the statute expressly provides that it "does not prevent

4

the maintenance of an action against the ski area operator for [ ] the negligent operation [ ] of the ski area". 32 M.R.S.A. § 15217(8)(A).[5] Nicholas' claim of negligent supervision clearly falls within the Act's "negligent operation" exclusion.

## Nicholas' Claim

The issue then becomes whether the boy's claim against the defendants has been effectively released by his mother. This issue requires an examination of the meaning and validity of the release language in the Ski Enrollment Form.

Releases in general are not against public policy. *See Emery Waterhouse Co. v. Lea*, 467 A.2d 986, 993 (Me. 1983). However, for its terms to be valid, a release absolving a defendant of liability for its own negligence "must spell out 'with greatest particularity' the intention of the parties contractually to extinguish negligence liability." The courts have "traditionally disfavored contractual exclusions of negligence liability and have exercised a heightened degree of judicial scrutiny when interpreting contractual language which allegedly exempts a party from liability for his own negligence." *See Hardy v. St. Clair*, 1999 ME 12, ¶3, 739 A.2d 368, 369, *citing Doyle v. Bowdoin College*, 403 A.2d 1206, 1207 (Me. 1979). The release must be construed strictly. *See Doyle*, 403 A.2d at 1207-08 (*citing*

---

[5] *See McGuire v. Sunday River Skiway Corp.*, 1994 WL 505035, *5 (D. Me.), in which Judge Hornby wrote "McGuire's argument for liability might have some appeal if her skiing instructor had encouraged her to do something inappropriate during her lesson. That might amount to negligent operation of the ski area."

Prosser, Torts, §68 (4th ed. 1971)) (it must appear that the terms of the release were "brought home to the plaintiff").

The release that Laurene signed on behalf of herself and Nicholas prevents claims

> "against [SRS], its owners, affiliates, employees and agents from any and all liability for all personal injury, including death or property damage *arising from* any alleged negligence in the operation and maintenance or design of the ski area and other conditions such as those listed in the WARNING above."

*See* Affidavit of Joseph R. Saunders, Esq. (emphasis added). This language is unambiguous and, if valid, clearly releases the defendants from liability for damages and losses sustained as a result of negligence in the operation of the ski area, which would include the claim of negligent supervision in this case. The interpretation of an unambiguous contract is a question of law, *see Fleet Bank of Maine v. Harriman*, 1998 ME 275, ¶ 4, 721 A.2d 658.

More to the point of this case, the issue is whether an unambiguous release of negligence claims given by a parent on behalf of her child is valid. The defendants cite *Zivich v. Mentor Soccer Club, Inc.*, 696 N.E.2d 201 (Ohio 1998), as support for their assertion that a parent can give a binding release of such claims on behalf of the child. However, *Zivich* stands for the more limited proposition "that parents have the authority to bind their minor children to exculpatory agreements in favor of <u>volunteers and sponsors of nonprofit sports activities</u> where the cause of action sounds in negligence." 696 N.E.2d at 374 (emphasis added). The decision was grounded on two public policy considerations: first, nonprofit sports organizations would be unable to get volunteers without such releases and

6

would go out of existence; and, second, parental authority to make and give such releases is of constitutional importance. However, the first consideration is inapplicable to the facts of this case -- none of the defendants is a nonprofit organization and McGuire was not a volunteer -- and the court is not persuaded by the second.

The defendants' do make a broader public policy argument addressed to the facts of this case. They assert that ski schools are offered by ski areas for the convenience and safety of their guests. If releases on behalf of minors are unenforceable, ski areas will be reluctant to offer training and instructions to children, whose safety will then be as risk. This is not an inconsequential point. However, it is a risk against which a for-profit business may insure itself.[6] This court cannot conclude that the public policy consideration espoused by the defendants is paramount to the right of the infant to his negligence claim.

There are numerous cases holding contrary to the defendants' position. *See, e.g., Scott v. Pacific West Mtn. Resort*, 834 P.2d 6 (Wash. 1992) (en banc); *Whitcomb v. Dancer*, 443 A.2d 458, 460 (Vt. 1982). Maine appears to side with these decisions. In the case of *Doyle v. Bowdoin College*, supra, the Law Court was unequivocal in its declaration, albeit

---

[6]The court is mindful that in *Zivich* the Ohio Supreme court determined that "insurance for the [nonprofit] organizations is not the answer, because individual volunteers may still find themselves potentially liable when an injury occurs." 696 N.E.2d at 371-72. However, the point in *Zivich*, which involves a volunteer, is distinguishable from this case, which involves a paid employee. While a volunteer may reasonably expect that he should suffer no penalty for the consequences of his gratuitous acts, a paid employee -- such as Defendant McGuire -- may not.

7

dicta,[7] that "[t]his Court has held that a parent, or guardian, cannot release the child's or ward's, cause of action." *Doyle v. Bowdoin College*, 403 A.2d at 1208 n.3. This language is too unequivocal to ignore. In fact, other courts holding in line with *Scott* have cited *Doyle* as support for this proposition. *See Scott*, 834 P.2d at 12 n.19; *see also International Union v. Johnson Controls, Inc.*, 499 U.S. 187, 214 (1991)(White, J., concurring) ("the general rule is that parents cannot waive causes of action on behalf of their children"); *Meyer v. Naperville Manner, Inc.*, 634 N.E.2d 411, 414 (Ill. App. 1994).

The court concludes that the claim for negligent supervision brought on behalf of Nicholas is not barred by the release provisions of the Ski Enrollment Form signed by his mother.

**Laurene's Claim**

Laurene's claim for lost wages arises out of and is dependant upon her son's claim for negligent supervision. As noted, the release language is unambiguous and clearly releases the defendants from liability for damages and losses "arising from any alleged negligence in the operation [] of the ski area", which includes the claim of negligent supervision in this case. Although this court concludes that Nicholas' cause of action survives the release provisions of the Ski Enrollment Form, his mother's claim does not. *See Scott v. Pacific West Mtn. Resort*, 834 P.2d at 12 (holding that although child's cause of action is not barred by parents' signing of release, parents'

---

[7]Although it is dicta, courts have cited *Doyle* for the proposition that a parent cannot release a child's causes of action.

claims based on child's injury are barred by unambiguous and conspicuous release); *see also Childress v. Madison Cty.*, 777 S.W.2d 1, 7-8 (Tenn. Ct. App. 1989) (although child and child's father are not bound by release signed by mother, she is barred from bringing claims based on child's injuries).

## Indemnification Clause

Finally, there remains the issue of whether Laurene is obligated to indemnify the defendants against Nicholas' cause of action.  In Maine, the Law Court views clauses "indemnifying a party against its own negligence with disfavor, and directs courts to construe them strictly against such a result."  *See International Paper Co. v. A&A Brochu*, 899 F.Sup. 715, 719 (D. Me. 1995), *citing Emery Waterhouse*, 467 A.2d at 993.  However, the court may uphold an indemnification agreement that <u>expressly</u> indemnifies the indemnitee against its own negligence in a manner that clearly reflects the mutual intent of the parties. "[A] clear reflection of mutual intent requires language from the face of which the parties unambiguously agree to indemnification for indemnitee negligence."  *See id.*  In *International Paper*, the court upheld the validity of such an indemnification clause that provided, as follows:

> "SELLER does hereby agree to indemnify and hold harmless PURCHASER from and against any and all claims, damages, debts, demands, suits, actions, attorney fees, court costs and expenses arising out of, attributable to, or resulting from SELLER'S or any supplier's said operations, *whether the same are caused or alleged to have been caused in whole or in part by the negligence of PURCHASER, Its (sic) agents or employees.*"

*Id.* (emphasis added).  However, unlike *International Paper*, it is not clear

9

that the indemnification provision in this case applies to the defendants' own negligence. [8] The Ski Enrollment Form provides as follows:

> "I hereby indemnify the ski areas named above, its owners, affiliates, employees and agents for all awards, legal expenses and settlements arising out of the child's participation in this clinic and the use of the ski area premises."

Employing a strict construction analysis, the court concludes that this language is ambiguous and does not reflect an express mutually intended agreement that Laurene will indemnify the defendants against their own negligence. In fact, it seems more suited to an interpretation that the indemnification is for losses or damages caused by Nicholas while participating in the ski school.

Based on the conclusion that the Ski Enrollment Form does not include an indemnification by Laurene against the defendants' own negligence, the court does not need to reach the plaintiffs' further claim that the indemnification clause is unconscionable as a contract of adhesion.

---

[8] *See McGraw v. S.D. Warren Co.*, 656 A.2d 1222, 1224 (Me. 1995), where the court held that Cianbro did not specifically agree to indemnify Warren for damages caused by Warren's own negligence where the clause provided:

> The contractor [Cianbro] is responsible for and shall continuously maintain protection of all the work and property in the vicinity of the work from damage or loss from any cause arising in connection with the contract and any work performed thereunder. [Cianbro] shall indemnify and hold owner [Warren] harmless for any claims, suits, losses or expenses including attorneys' fees suffered by [Warren] arising out of injury to any person including [Warren's] or [Cianbro's] employees or damage to any property, including [Warren's] property if the injury or damage is caused in whole or in part by [Cianbro] or any of [Cianbro's] subcontractors, material men or anyone directly or indirectly employed or otherwise controlled by any of them while engaged in the performance of any work hereunder.

10

DONALD L. GARBRECHT
LAW LIBRARY

MAY 11 2000

*See Dairy Farm Leasing Co., Inc. v. Hartley*, 395 A.2d 1135, 1139-40 (Me. 1978) ("where a standard-form, printed contract is submitted to the other on a 'take it or leave it' basis, upon equitable principles the provisions of the contract are generally construed to meet the reasonable expectations of the party in the inferior bargaining position; when a contract of adhesion is exacted by the overreaching of a party, the defense of unconscionability may be asserted").

Pursuant to Rule 79(a) M.R.Civ.P., the Clerk is directed to enter this Decision and Order on the Civil Docket by a notation incorporating it by reference, and the entry shall be:

Plaintiff Laurene's Motion for Summary Judgment on Defendants' Counterclaim is GRANTED;

Defendants' Motion for Summary Judgment on Count I of Plaintiffs' Complaint is DENIED; and

Defendants' Motion for Summary Judgment on Count II of Plaintiffs' Complaint is GRANTED.

Dated: May 8, 2000

_____
Justice, Superior Court

11